FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

**SEP 13 2010**

Stephan Harris, Clerk
Casper

Stuart R. Day #5-2244
Ryan Schwartz #6-3611
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400 (82601)
P.O. Box 10700
Casper, Wyoming 82602-3902
Telephone: (307) 265-0700
Facsimile:   (307) 266-2306
Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| BLACK DIAMOND ENERGY PARTNERS 2001-A LTD., et al. ) <br> ) <br> ) <br> Plaintiffs, ) <br> ) <br> vs. ) <br> ) <br> S&T BANK, ) <br> ) <br> Defendant. ) | Civil Action No.: ~~Cv-2010-0714~~ <br> 10C V192 F |

## DEFENDANT'S PETITION AND NOTICE OF REMOVAL

Defendant S&T Bank ("S&T"), by and through its counsel Williams, Porter, Day and

Neville, P.C., pursuant to Fed. R. Civ. P. 81(c), U.S.D.C.L.R. Rule 81.1, 28 U.S.C. § 1331,

28 U.S.C. § 1441 and 28 U.S.C § 1446, hereby petitions this Court to remove the civil action

filed by the above referenced Plaintiffs in the State of Wyoming, Fourth Judicial District

Court for Johnson County, Wyoming to the United States District Court for the District of

Wyoming.

In support of its *Petition*, S&T states as follows:

1.  On August 6, 2010 Plaintiffs, Nevada limited partnerships, commenced an action against S&T, a Pennsylvania bank, titled *Black Diamond Energy Partners 2001-A LTD., et al. v. S&T Bank,* in the State of Wyoming Fourth Judicial District Court, Johnson County as Civil Action No. CV-2010-0114 (hereinafter referred to as "State Court Action"). *True and correct copies of the Summons and Complaint filed in the State Court are attached hereto as Exhibit "A" and are incorporated herein by this reference.*

2.  Plaintiff served its action by certified mail on S&T on August 12, 2010.

3.  On September 9, 2010, Williams, Porter, Day & Neville, P.C., attorneys Stuart Day and Ryan Schwartz entered SPECIAL ENTRIES OF APPEARANCE for the purposes of contesting personal jurisdiction over defendant S&T Bank.

3.  S&T contends that the pending State Court Action is subject to removal[1] pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1441(a) and (b), as the State Court Action is a civil action arising under the laws of the United States.

4.  28 U.S.C. §1331 provides that the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

5.  As exhibited in Plaintiffs' *Complaint* filed in the State Court Action, certain of Plaintiffs claims arise under federal government Public Law 110-343, enacted on October 3,

---

[1] Removal, in itself, does not constitute a waiver of any right to object to lack of personal jurisdiction, 5 C. Wright & A. Miller, Federal Practice and Procedure, § 1395 (1969), but after removal, the federal court takes up the case where the state court left off. Nationwide Engineering & Control Systems, Inc. v. Thomas, 837 F.2d 345, 348 (8th Cir. 1988) *citing* Granny Goose Foods, Inc. v. Brotherhood of Teamsters, 415 U.S. 423, 436, 39 L. Ed. 2d 435, 94 S. Ct. 1113 (1974)

2008, and signed into law by President George W. Bush, which includes the Emergency Economic Stabilization Act of 2008, 12 U.S.C. §5201 *et seq.* and the Troubled Asset Relief Program ("TARP"). *See Exhibit "A" at p. 10, ¶ 42.*

6. A disputed federal question exists between the parties; therefore, the federal district courts have original jurisdiction over the above-referenced case.

7. In compliance with 28 U.S.C. § 1446(a), attached hereto as Exhibit "B" and incorporated herein by reference, are true and correct copies of all process, pleadings, and orders served upon S&T in the State Court Action.

8. In compliance with 28 U.S.C. § 1446(b), S&T has filed this *Petition and Notice of Removal* within thirty (30) days after receipt of Plaintiffs' *Complaint.*

9. The United States District Court for the District of Wyoming is the proper District Court of the United States to which this matter should be removed. 28 U.S.C. § 1441(a).

10. As required by 28 U.S.C. §1446(d) and Rule 81.1 U.S.D.C.L.R., S&T is simultaneously filing a copy of this *Petition* and *Notice of Removal* with the Clerk of the Fourth Judicial District Court, Johnson County, Wyoming and counsel for the Plaintiffs. Attached hereto as Exhibit "C" and incorporated herein by reference is a copy of the pleading to be filed with the State of Wyoming Fourth Judicial District Clerk of Court.

11. The filing fee of Three Hundred Fifty Dollars ($350.00) is tendered to this Court together with the *Petition and Notice of Removal.*

**WHEREFORE**, Defendant S&T respectfully requests that this Court enter its Order removing the civil action titled *Black Diamond Energy Partners 2001-A LTD., et al. v. S&T Bank*, in the State of Wyoming Fourth Judicial District Court, Johnson County as Civil Action No. CV-2010-0114 to the United States District Court for the District of Wyoming and for such other and further relief as the Court deems just and proper.

**DATED** this _____ day of September, 2010.

**Defendant S&T Bank**

By: _____

Stuart R. Day, WSB #5-2244
Ryan Schwartz, WSB# 6-3611
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400 (82601)
P.O. Box 10700
Casper, Wyoming 82602-3902
(307) 265-0700
(307) 266-2306 facsimile
sday@wpdn.net

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing *Petition and Notice of Removal* was served upon counsel by placing the same in the United States mail, postage prepaid, and addressed to the following this _____ day of September, 2010.

> Greg L. Goddard, WSB #5-1252
> Goddard, Wages & Vogel
> 412 North Main Street
> Buffalo, Wyoming 82834

Stuart R. Day

# EXHIBIT

# "A"

## Summons and Complaint

# FOR SERVICE

## IN THE DISTRICT COURT OF JOHNSON COUNTY, WYOMING

### FOURTH JUDICIAL DISTRICT

(1) BLACK DIAMOND ENERGY PARTNERS 2001-A LTD.,
(2) BLACK DIAMOND ENERGY PARTNERS 2001-B LTD.,
(3) BLACK DIAMOND ENERGY PARTNERS 2002-A LTD.,
(4) BLACK DIAMOND ENERGY PARTNERS 2002-B LTD.,
(5) BLACK DIAMOND ENERGY PARTNERS 2003-A LTD.,
(6) BLACK DIAMOND ENERGY PARTNERS 2003-B LTD.,
(7) BLACK DIAMOND ENERGY PARTNERS 2004-A LTD.,
(8) BLACK DIAMOND ENERGY PARTNERS 2004-B LTD.,
(9) BLACK DIAMOND ENERGY PARTNERS 2005-A LTD.,
(10) BLACK DIAMOND ENERGY PARTNERS 2005-B LTD.,
(11) BLACK DIAMOND ENERGY PARTNERS 2005-C LTD.,
(12) BLACK DIAMOND ENERGY PARTNERS 2006-A LTD.,
(13) BLACK DIAMOND ENERGY PARTNERS 2006-B LTD.,
(14) BLACK DIAMOND ENERGY PARTNERS 2007-A LTD.,
(15) BLACK DIAMOND ENERGY PARTNERS 2007-B LTD.,
(16) BLACK DIAMOND ENERGY PARTNERS 2008-A LTD.,
(17) BLACK DIAMOND ENERGY PARTNERS 2008-B LTD.

Plaintiffs,

vs.

S&T BANK,

Defendant.

**Civil Action No:**

Cv -2010- 0 1 1 4

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:   **S&T BANK**
**800 Philadelphia Street**
**Indiana, PA  15701**

YOU ARE HEREBY SUMMONED and required to file with the Clerk and serve upon Plaintiffs' attorney an answer to the Complaint which is herewith served upon you within 20 days after service of this Summons upon you, exclusive of the day of service.  (If service upon you is made outside of the State of Wyoming, you are required to file and serve your answer to the Complaint within 30 days after service of this Summons upon you, exclusive of the day of service.)

1

If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint.

DATED this _6th_ day of August, 2010.

(SEAL OF DISTRICT COURT)

**THELMA M. AXPERO**

Clerk of Court

By _Debra R. Vandel_
Deputy Clerk

Greg L. Goddard, WSB #5-1252
Attorney for Plaintiffs
Goddard, Wages & Vogel
412 North Main Street
Buffalo, Wyoming 82834
(307) 684-9595

2

CERTIFIED COPY

## IN THE DISTRICT COURT OF JOHNSON COUNTY, WYOMING

### FOURTH JUDICIAL DISTRICT

(1) BLACK DIAMOND ENERGY PARTNERS 2001-A LTD.,
(2) BLACK DIAMOND ENERGY PARTNERS 2001-B LTD.,
(3) BLACK DIAMOND ENERGY PARTNERS 2002-A LTD.,
(4) BLACK DIAMOND ENERGY PARTNERS 2002-B LTD.,
(5) BLACK DIAMOND ENERGY PARTNERS 2003-A LTD.,
(6) BLACK DIAMOND ENERGY PARTNERS 2003-B LTD.,
(7) BLACK DIAMOND ENERGY PARTNERS 2004-A LTD.,
(8) BLACK DIAMOND ENERGY PARTNERS 2004-B LTD.,
(9) BLACK DIAMOND ENERGY PARTNERS 2005-A LTD.,
(10) BLACK DIAMOND ENERGY PARTNERS 2005-B LTD.,
(11) BLACK DIAMOND ENERGY PARTNERS 2005-C LTD.,
(12) BLACK DIAMOND ENERGY PARTNERS 2006-A LTD.,
(13) BLACK DIAMOND ENERGY PARTNERS 2006-B LTD.,
(14) BLACK DIAMOND ENERGY PARTNERS 2007-A LTD.,
(15) BLACK DIAMOND ENERGY PARTNERS 2007-B LTD.,
(16) BLACK DIAMOND ENERGY PARTNERS 2008-A LTD.,
(17) BLACK DIAMOND ENERGY PARTNERS 2008-B LTD.

Plaintiffs,

vs.

S&T BANK,

Defendant.

FILED 4TH JUDICIAL DISTRICT COURT

CASE NO. _____

AUG 0 6 2010

JOHNSON COUNTY, WYOMING
_____
Clerk of District Court

**Civil Action No:**

Cv -2010- 0 1 1 4

**JURY TRIAL DEMANDED
ATTORNEY LIEN CLAIMED**

### COMPLAINT

Plaintiffs, by and through their undersigned counsel and for their cause of action against

the named Defendant herein, allege and state as follows:

### I.   *PARTIES; JURISDICTION & VENUE:*

1.   The Plaintiffs, BLACK DIAMOND ENERGY PARTNERS 2001-A LTD.,

BLACK DIAMOND ENERGY PARTNERS 2001-B LTD., BLACK DIAMOND ENERGY

PARTNERS 2002-A LTD., BLACK DIAMOND ENERGY PARTNERS 2002-B LTD.,

BLACK DIAMOND ENERGY PARTNERS 2003-A LTD., BLACK DIAMOND ENERGY

PARTNERS 2003-B LTD., BLACK DIAMOND ENERGY PARTNERS 2004-A LTD.,

BLACK DIAMOND ENERGY PARTNERS 2004-B LTD., BLACK DIAMOND ENERGY

PARTNERS 2005-A LTD., BLACK DIAMOND ENERGY PARTNERS 2005-B LTD.,

BLACK DIAMOND ENERGY PARTNERS 2005-C LTD., BLACK DIAMOND ENERGY
PARTNERS 2006-A LTD., BLACK DIAMOND ENERGY PARTNERS 2006-B LTD.,
BLACK DIAMOND ENERGY PARTNERS 2007-A LTD., BLACK DIAMOND ENERGY
PARTNERS 2007-B LTD., BLACK DIAMOND ENERGY PARTNERS 2008-A LTD., and
BLACK DIAMOND ENERGY PARTNERS 2008-B LTD., are Nevada limited partnerships, in
good standing, that reside in, and have their principal places of business, operations and
substantial assets, including without limitation real property and mineral interests located within,
Johnson County, Wyoming (collectively, the "Plaintiffs").

2.      More particularly, Plaintiffs are limited partnerships comprised of approximately,
and in the aggregate, 3,800 limited partners and two general managing partners who are
domiciled within, and citizens of, Wyoming and various other states across the nation, including
without limitation the Commonwealth of Pennsylvania.

3.      Defendant S&T Bank ("Defendant" or "S&T Bank") is a state-chartered bank
domiciled within and having its principal place of business located within the Commonwealth of
Pennsylvania.

4.      The citizenship of Plaintiffs is not diverse from the citizenship of Defendant
pursuant to *Carden v. Arkoma Associates*, 494 U.S. 185, 110 S.Ct. 1015, 108 L.Ed.2d 157
(1990).

5.      Defendant's acts and omissions complained of herein and which form the basis of
the claims for relief Plaintiffs raise in this civil action occurred in substantial part in Johnson
County, Wyoming, and the cause of action herein alleged arose within Johnson County,
Wyoming.

6.      This Court has jurisdiction over the parties and the subject matter of this civil
action in that it exceeds the jurisdictional minimum of this Court. Venue is proper in this Court

2

and within Johnson County, Wyoming.

## II. *FACTS COMMON TO ALL CLAIMS:*

7.      Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

### A. *Identity of Plaintiffs and their General Managing Partners, BDE and BDED.*

8.      Plaintiffs, collectively and/or severally, are or have been owners of or have participated in approximately 430 coal bed methane ("CBM") gas wells, more or less (collectively and/or severally, the "Wells"), lying situate within Johnson, Converse, Sublette, Sweetwater and Campbell Counties, all within the State of Wyoming.

9.      **BLACK DIAMOND ENERGY, INC.,** a Wyoming corporation ("**BDE**") is and has served as the duly-authorized Managing General Partner of Plaintiffs Black Diamond Energy Partners 2001-A Ltd., Black Diamond Energy Partners 2001-B Ltd., Black Diamond Energy Partners 2002-A Ltd., Black Diamond Energy Partners 2002-B Ltd., Black Diamond Energy Partners 2003-A Ltd., Black Diamond Energy Partners 2003-B Ltd., Black Diamond Energy Partners 2004-A Ltd., Black Diamond Energy Partners 2004-B Ltd., Black Diamond Energy Partners 2005-A Ltd., Black Diamond Energy Partners 2005-B Ltd., Black Diamond Energy Partners 2005-C Ltd., and Black Diamond Energy Partners 2006-A Ltd., and owner of 36% and/or 40% of said limited partnerships at all times relevant hereto.

10.     BDE is a wholly-owned subsidiary of **KOVAL RESOURCES, LLC,** a Nevada limited liability company ("Koval Resources").

11.     **BLACK DIAMOND ENERGY OF DELAWARE, INC.,** a Delaware corporation ("**BDED;**" as sometimes employed herein, the term "BDE" shall mean collectively BDE and BDED, the General Managing Partners of Plaintiffs), is and has served as the duly-authorized Managing General Partner of Plaintiffs Black Diamond Energy Partners 2006-B Ltd.,

3

Black Diamond Energy Partners 2007-A Ltd., Black Diamond Energy Partners 2007-B Ltd., Black Diamond Energy Partners 2008-A Ltd., and Black Diamond Energy Partners 2008-B Ltd., and owner of 36% of said limited partnerships at all times relevant hereto.

12.     BDED is a wholly-owned subsidiary of **KOVAL ENERGY, LLC**, a Delaware limited liability company ("Koval Energy").

13.     At all times relevant to the claims alleged in this *Complaint* and underlying all of the claims for relief alleged herein, Defendant had actual, first-hand knowledge of the existence of the Wells, ownership percentages in the Wells, the existence of the limited partnership Plaintiffs, the fact Plaintiffs' Managing General Partners were either BDE or BDED, and that Plaintiffs owned significant interests in the Wells and other property further described herein and were wholly reliant upon BDE and BDED to maintain and oversee the Wells and their assets and operate the Wells and Plaintiffs' businesses.

**B.     *Defendant's Underlying Loans.***

14.     On or about September 20, 2002, Defendant and Koval Resources entered into a loan agreement under which Defendant agreed to lend to Koval Resources the sum of $5,000,000.00 for working capital (the "Loan"). The Loan was guaranteed by Black Diamond Supply, Inc., and the owners and principal officers and directors of Koval Resources and BDE, Charles Koval ("Chuck") and Eric Koval ("Eric") (along with their respective spouses), and collateralized by all assets of Koval Resources and its guarantors under the Loan. The Loan was also collateralized by oil and gas leasehold mortgages pledged by BDE to Defendant in Converse, Johnson and Campbell Counties, Wyoming, encumbering BDE's interests therein, and BDE's collateral assignment of BDE's interests in leases and pipelines in Converse, Johnson and Campbell Counties, Wyoming. The maturity date under the Loan was December 23, 2002.

15.     On or about September 20, 2002, Defendant and Koval Resources entered into an

4

amendment of the Loan, by which they agreed to an extension of the Loan's maturity date by one year or to December 31, 2003 (the "First Amendment to Loan").

16.     On or about October 29, 2003, Defendant and Koval Resources entered into another amendment of the Loan, by which Defendant agreed to increase the principal amount to the sum of $10,000,000.00 and the parties agreed to an extension of the Loan's maturity date by another year or to December 31, 2004 (the "Second Amendment to Loan").

17.     On or about November 11, 2004, Defendant and Koval Resources entered into another amendment of the Loan, by which Defendant agreed to increase the principal amount to the sum of $15,000,000.00, with a sub-note totaling $2,300,000.00, and the parties agreed to an extension of the Loan's maturity date by another year or to December 31, 2005 (the "Third Amendment to Loan").

18.     On or about November 14, 2005, and after the sub-note under the Third Amendment to loan was paid in full, Defendant and Koval Resources entered into another amendment of the Loan, by which Defendant agreed to increase the  principal  amount to a firm sum of $15,000,000.00 (the "Fourth Amendment to Loan").

19.     On or about January 31, 2006, Defendant and Koval Resources entered into another amendment of the Loan, by which the parties agreed to an extension of the Loan's maturity date by another year or to December 31, 2006 (the "Fifth Amendment to Loan").

20.     On or about January 11, 2007, Defendant and Koval Resources entered into another amendment of the Loan, by which the parties agreed to an extension of the Loan's maturity date by another year or to December 31, 2007 (the "Sixth Amendment to Loan").

21.     On or about January 11, 2007, Defendant and Koval Resources entered into an additional amendment of the Loan, by which Defendant agreed to increase its loan commitment to the sum of $20,000,000.00 and pursuant to which Defendant required Koval Resources to

5

assign its deposit accounts and add, as a separate guarantor, BDED (the "Seventh Amendment to Loan").

22.     On or about January 15, 2008, Defendant and Koval Resources entered into another amendment of the Loan, by which the parties agreed to an extension of the Loan's maturity date by another year or to December 31, 2008 (the "Eighth Amendment to Loan").  In addition, Defendant required, under the Eighth Amendment to Loan, that BDE and BDED execute Control Agreements, whereby they gave Defendant as security for the Loan all of their rights, titles and interests in and to, *inter alia*, all partnership interests in and to the partnerships and all additional partnership interests or warrants or options of the partnerships as acquired by BDE and BDED.

23.     On or about January 29, 2009, Defendant and Koval Resources entered into an additional amendment of the Loan, by which the parties agreed to an extension of the Loan's maturity date to February 28, 2009 (the "Ninth Amendment to Loan; the Loan and all amendments thereto are sometimes collectively referred to as the "Loan ").

24.     In addition to the Loan alleged above, Koval Resources and/or Koval Energy and/or BDE took out various term loans with the bank in the principal sums of $3,320,000.00, made on or about November 5, 2007, $10,000,000.00, made on or about May 2, 2007, and $1,500,000.00, made on or about July 28, 2008 (collectively, the "Additional Loans;" sometimes the Loan and Additional Loans are collectively referred to herein in the singular as the "Loan").

25.     Since the Loan was originally made in 2002 and throughout all of the time period in which the parties entered into the First Amendment to Loan, the Second Amendment to Loan, the Third Amendment to Loan, the Fourth Amendment to Loan, the Fifth Amendment to Loan, the Sixth Amendment to Loan, the Seventh Amendment to Loan, the Eighth Amendment to Loan, the Ninth Amendment to Loan and the Additional Loans, Koval Resources and Koval

6

Energy, BDE and BDED complied substantially with the terms and conditions of the Loan and paid down the Loan substantially, and Defendant has never made Koval Resources, Koval Energy, BDE or BDED aware of Defendant's having declared or intending to declare any event of default under the Loan.

## C. *The 2008 Nationwide Financial Crisis, Natural Gas Prices and the Impact on BDE Operations.*

26.    In the spring of 2008, the United States experienced the onset of a financial crisis stemming from, *inter alia*, a severe housing slump leading to substantial losses in mortgage-backed securities and resulting in a glut of homes on the market, depressed housing prices and a financial crisis, with many lenders and financial investors throughout the country. As a result, banks and other financial institutions began tightening their lending requirements and ceasing to advance credit.

27.    Around this time, the price of natural gas had decreased and continued to decrease in Wyoming and elsewhere.

28.    In view of the decline in natural gas prices and given financial concerns that decline caused BDE, along with the failure and refusal of natural gas company EnCana, with whom BDE had invested significant sums, to fracture certain wells that negatively affected production for BDE and timely deliver joint interest billing statements, BDE's principal officers, Eric and Chuck, determined they should express their concerns to Defendant.

## D. *BDE's Meetings with S&T Bank.*

29.    In August 2008, Chuck sought and obtained a face-to-face meeting with Defendant's officers Dick Black, the long-time loan officer involved in making the Loan, as later amended, and David Anatolik. At this meeting Chuck and Laura Woodruff, an owner, director and officer of BDE in charge of broker-dealer relations, expressed their financial concerns about not being able to sell assets to improve cash flow as the price of natural gas declined and about

7

the difficulties BDE was having with EnCana's failure to timely fracture wells for over eight months which severely and negatively impacted cash flow, and they suggested that Defendant consider the participation of banks in addition to S&T Bank so as to increase lending capacity to help BDE and the bank make it through this financial slump.

30.    Although Chuck had called this meeting with Defendant to apprise it of BDE's financial concerns about the future, Messrs. Black and Anatolik, instead, spent the entire meeting trying to convince Chuck and Laura that S&T Bank was a sound bank, that it would survive the financial crisis and that S&T Bank would work through this crisis with BDE and had no intention of "dumping" BDE.

31.    In September 2008, and at the request of Eric and Chuck, they again met face-to-face with Defendant's representatives, Messrs. Black and Anatolik, to advise Defendant that BDE was extremely tight on cash-flow, that gas prices remained low and continued to decline, that financials relative to BDE's operations were not yet ready, that the EnCana situation had exacerbated BDE's financial distress, and that BDE was in the process of cost-cutting through the elimination of its Pittsburgh, Pennsylvania office and moving all operations to Wyoming where primary operations and the Wells were located. They also related to Messrs. Black and Anatolik a negative financial picture if BDE was unable to raise additional monies by year-end.

32.    In this meeting, Eric and Chuck presented to Defendant four options they had formulated that outlined how BDE planned to get out of the financial pinch. They described to Messrs. Black and Anatolik the additional assets BDE would be able to pledge in order to obtain a bridge loan. They shared with Messrs. Black and Anatolik the feedback they had received from Oil & Gas Clearinghouse regarding low bid prices on sale of CBM assets Powder River Basin region to further illustrate the potential negative financial impact on the horizon. They also shared with Messrs. Black and Anatolik a potential restructuring concept which would

8

provide additional collateral to Defendant in exchange for a bridge loan. Finally, they explained to Messrs. Black and Anatolik that one negative side effect of BDE's financial slump could be BDE's inability to pay vendors, resulting in vendor liens being filed against the Wells, and BDE's possible removal, in such instance, as operator of the Wells and the resulting loss of revenues.

33.    At and after this meeting, Defendant did not declare or otherwise express the Loan to be in default, or otherwise express its concern with BDE's financial prospects or operations.

34.    On or about November 7, 2008, Eric and Chuck called a third meeting with Defendant. Again, Defendant's representatives, including Messrs. Black and Anatolik, met with Eric and Chuck.

35.    In this November meeting, Eric and Chuck informed Defendant that the price of natural gas had continued to decline, that BDE's financial condition and financial concerns had continued to worsen, and that the bids received through Oil & Gas Clearinghouse for certain of Plaintiffs' assets were below expectations. Eric and Chuck requested a bridge loan of $1,800,000 to enable them to "bridge" their financial situation, given BDE's then-current availability under the Loan of approximately $900,000.

36.    As with the September meeting, at and after this November meeting, Defendant did not declare or otherwise suggest the Loan was in default or that Defendant was concerned with BDE's financial prospects or operations.

37.    In December 2008 BDE's management continued to apprise Defendant of its deteriorating financial situation and its efforts to address the situation.

    E.    *Beginning of Defendant's Dominion Over BDE and Plaintiffs' Assets.*

38.    Throughout January 2009, BDE made numerous efforts to locate sources of

9

funding other than a bridge loan from Defendant but was unable to procure the same. Because of the national financial crisis, lenders, including mezzanine financiers, related to BDE there was no liquidity in the marketplace for loans to small businesses, such as BDE, or to oil and gas entities.

39.     Prior to and throughout this time, S&T Bank had frozen BDE's ability to draw any further availability under the Loan, including the approximately $900,000 in availability under the Loan.

40.     On or about January 20, 2009, Powder River Energy Corporation ("PRECorp"), the provider of local electricity, gave notice to BDE that it intended to shut off power to certain of the Wells unless all outstanding invoices, totaling approximately $66,000, and an additional $100,000 security deposit, were paid. With its ability to draw on its credit line frozen and with insufficient cash available for use, BDE was unable to pay PRECorp its demanded sum, and the electricity to those Wells was thereafter, and on or about January 26, 2009, shut off.

41.     At this time Eric spoke with Mr. Black to inform him that the power would be shut-off and that BDE's production would be halted as a result. Eric informed Mr. Black that BDE could not continue operations any further without S&T Bank's assistance.

42.     Prior to this time, on or about January 16, 2009, Defendant's holding company, S & T Bancorp, received $108,676,000 in TARP (Troubled Asset Relief Program) bailout funds from the United States Treasury Department. One of the main purposes of the Treasury Department's payout of TARP funds to financial institutions such as Defendant was to encourage these banks to resume lending again at levels seen before the financial crisis had begun, not only to consumers but also to businesses. Upon information and belief, Defendant had and continues to have full access to S&T Bancorp's TARP bailout funds and has repaid nothing to the Treasury Department in connection with its bailout.

43.     In February 2009, Koval Resources, Koval Energy, BDE and BDED were

10

financially incapable, for the first time in their relationship with S&T Bank, to make payment to Defendant under the Loan.

44. From February 18-20, 2009, Mr. Black and George Brikis, a third-party consultant and agent of S&T Bank, traveled to Wyoming to meet with BDE's management in person.

45. At this meeting BDE management explained in detail to Messrs. Black and Brikis the urgent and immediate need to get electricity to the Wells turned back on with PRECorp, the detriment that continued lack of electricity would have on the Wells, including the loss of allocation of electricity by PRECorp, the threat of PRECorp's lienable claims against the Wells, BDE's situation with EnCana, and EnCana's continued refusal to account to BDE, among other things. Had electricity been restored to the Wells by this time, damage or loss relating to the Wells would have been minimized or almost fully mitigated.

46. At this meeting BDE also reiterated to Defendant that BDE be allowed to use some of the funds held in Chuck's personal Wealth Management Account at S&T Bank to run BDE operations, funds that had been pledged to Defendant but that Defendant had previously refused to allow BDE to use.

47. Unlike their prior meetings, Defendant's representatives responded negatively at the February 2009 meeting. Mr. Brikis informed BDE that Defendant was looking at liquidation of BDE and that he had not been sent to assist BDE in any way but to assess assets and conduct an investigation of BDE's operations.

48. On or about March 4, 2009, Chuck and other BDE management and counsel met with Defendant's representatives face-to-face in Pennsylvania. Mr. Brikis, Defendant's agent, also attended this meeting. At this meeting BDE again requested that Defendant allow BDE to access its availability under the Loan and extend an additional $1,800,000, so BDE could

11

continue operations. BDE also reiterated its request to access the funds held in Chuck's Wealth Management Account at S&T Bank.

49. At this meeting, BDE representatives again advised Defendant that BDE continued to lose electrical allocation by not having paid PRECorp's prior invoices and security deposit, that PRECorp had threatened the filing of liens, and the consequences of continuing to lose electrical allocation. They further explained the consequences of continuing to lose electrical allocation and the inability of BDE to restart production immediately without electricity.

50. Defendant advised BDE at that meeting that it would consider the request, but again, BDE would have to come up with more money. Defendant also represented that it was contemplating that a Forbearance Agreement would be put in place between the parties to the Loan, and BDE requested a copy of such a document and the specific terms and conditions being proposed. Defendant agreed to provide a "term sheet" for the Forbearance Agreement to BDE to review.

51. On or about the week of March 8-12, 2009, Mr. Brikis visited BDE's Wyoming office at the request and on behalf of Defendant. BDE employees met with Mr. Brikis and afforded him access to all documents and information.

52. Throughout Mr. Brikis' visit, BDE employees informed him of the fact that leases were in jeopardy of being lost, surface use payments were due and in arrears, back-taxes were due and payable on property, taxes were due and payable on pipeline and gathering equipment, BDE's operations ran the risk of losing favorable contract terms with gas gathering companies, BDE continued to be at risk of losing electrical allocation from PRECorp and the related detriment associated therewith, and that it would be increasingly difficult, having lost electricity and electrical allocation, to be able to restart production.

12

53. Based upon his examination of the books and records of BDE and BDE's operations, in March 2009, Mr. Brikis delivered to Defendant his report about Defendant's collateral position, showing that upon liquidation of the companies, S&T Bank's share of the liquidation would be roughly $21,000,000 (the "Brikis Report"). The Brikis Report failed to take into account Plaintiffs' interests in the Wells and otherwise.

54. Toward the end of his time reviewing BDE's books and records, Brikis discussed a work-out scenario with BDE representatives, stating that S&T Bank would put together a plan for funding, representing that BDE's operations would survive through September 2009, that BDE would be put on a budget and that Mr. Brikis, on Defendant's behalf, would be involved in reviewing expenditures of BDE operations for approval.

### F. *Forbearance Agreement Terms, Imposition of a CRO and Use of BDE and BDED as Alter Egos and Instrumentalities of S&T Bank.*

55. On or about March 24, 2009, Chuck, Eric and other BDE management and counsel again met with Defendant, at which meeting Mr. Black, Mr. Brikis, the bank's Chief Credit Officer Tony Kalsen, the bank's President Todd Bryce, and the bank's counsel were present. At that meeting Defendants' representatives discussed with Chuck and Eric a bullet-point "term sheet," listing for the first time certain terms and conditions to the proposed Forbearance Agreement S&T Bank had previously discussed with them. Defendant, however, did not furnish Chuck and Eric or BDE's counsel with an actual draft of the Forbearance Agreement so they could review all proposed terms and conditions. The term sheet contained provisions that were unreasonable and to which BDE could neither in good faith nor good conscience agree, including the payment of an approximate $320,000 "forbearance fee" and the grant of 25% equity in BDE's businesses to Defendant. Defendant indicated it would not deviate much from the forbearance terms as proposed in the term sheet,

56. Defendant intended to keep Eric and Chuck, and hence BDE, in the dark

13

concerning key terms and conditions of the proposed Forbearance Agreement so as to continue to induce Eric and Chuck, and hence BDE, to voluntarily comply with S&T Bank's demands, protect the bank's collateral and not take any rightful action available to BDE that might otherwise impair the bank's ability to secure its position or its collateral or as would be in BDE's and/or Plaintiffs' best interest.

57.     One of the requirements in Defendant's "term sheet" for BDE to obtain Defendant's forbearance of the exercise of its rights under the Loan, was that BDE appoint a "Chief Restructuring Officer" ("CRO") to manage and oversee the day-to-day affairs of BDE on terms, conditions and scope of responsibilities acceptable to the bank. Defendant further required BDE to select a CRO from a list of three persons Defendant provided to BDE management. The terms and conditions of the Loan and all documents executed incident to the Loan, or in respect to the various amendments thereto, did not require Koval Resources, Koval Energy, BDE or BDED to accept or approve appointment of a CRO or a change in management of those businesses, and as of the time a CRO was first mentioned, Defendant had still never declared or otherwise suggested to BDE that the Loan was in default.

58.     BDE and its management and counsel protested Defendant's requirement for the appointment of a CRO; however, Defendant, with the promise of a Forbearance Agreement, persisted to coerce BDE toward appointment of a CRO.

59.     Within this time frame, and using its best business judgment in good faith and in the best interests of BDE and BDE's businesses, including without limitation operation of the Wells and serving as Managing General Partner of the limited partnership Plaintiffs and Plaintiffs' assets and affairs, BDE interviewed or attempted to interview the persons Defendant listed on its CRO short-list, except Brikis. BDE actively sought to and did in fact interview candidates for a CRO position which were not on the bank's list, whom it could propose to

14

Defendant to serve in a CRO capacity as Defendant required. On two separate occasions BDE proposed its selected third-parties to Defendant, and Defendant refused to accept said third-parties to serve as CRO for BDE, requiring instead that BDE select one of the individuals reflected on Defendant's list.

60.    On or about March 25, 2009, BDE, after having discussed the terms and conditions of the term sheet with Defendant, verbally advised S&T Bank that the terms as proposed in the term sheet, as verbally modified the day before, were generally acceptable and requested an actual draft Forbearance Agreement to review.

61.    On or about March 26, 2009, without having ever given notice to BDE of default or claimed insecurity under the Loan or any other type of notice of deficiencies thereunder, and without providing notice to BDE of its intended actions, Defendant froze all of BDE's remaining bank accounts and continued to freeze BDE's credit line under which BDE still had approximately $900,000 in availability.

62.    As a result of Defendant's actions in freezing BDE's bank accounts, BDE checks were returned without payment, including without limitation checks that had been written to vendors in respect to the Wells and operations of the limited partnership Plaintiffs and revenue checks that had been written to royalty owners.

63.    On or about March 27, 2009, Defendant, by and through its duly authorized representative, employee and officer, Jim Walsh, instructed BDE employee Dan Groskop that BDE was no longer authorized to pay salaries or compensation, accrued or as would later accrue, to Eric or Chuck, BDE's principal officers, owners, directors, and management. Upon further inquiry, Mr. Groskop was advised by Mr. Walsh to release payroll to include Eric and Chuck's accrued compensation, and Mr. Groskop followed Mr. Walsh's instructions and did so.

64.    When payroll was subsequently presented to Defendant for payment, Defendant

15

rejected the entire payroll and refused to pay the same, advising Mr. Groskop that it was refusing payment because compensation for Eric and Chuck had been included.

65.     On or about March 31, 2009, Defendant instructed BDE not to pay any further payroll to BDE employees until a CRO from Defendant's list was put in place by Eric and Chuck, and hence BDE. Defendant also informed BDE that until such CRO was put in place, a draft of the Forbearance Agreement would not be delivered to BDE or its counsel. As a result of Defendant's decision, BDE was unable to fund payroll for its employees.

66.     On or about this same date, Defendant, by and through its duly authorized representative, employee and officer, Tony Kalsen, instructed BDE to communicate only with Mr. Walsh and forbade BDE from contacting Mr. Black, its long-time loan officer, or Mr. Bryce, about any matter incident to Defendant, the Loan or BDE's business operations.

67.     With all bank accounts and previously-agreed loan availability frozen, on or about April 1 2009, BDE interviewed Tim Shaffer ("Shaffer") of Morris-Anderson & Associates, Ltd. ("MAA;" jointly and/or severally as employed in this *Complaint*, the term CRO is intended to embrace the Chief Restructuring Officer, including without limitation Shaffer and MAA), one of the three persons whose names Defendant had provided to BDE on Defendant's list.

68.     On or about April 7, 2009, and under extreme pressure and coercion from Defendant, with the promise of exonerating Eric and Chuck from their personal guaranties under the initial forbearance term sheet, BDE executed an "Agreement for Consulting Services" with Shaffer of MAA (the "CRO Agreement"), whereby Shaffer and MAA would serve as CRO of BDE's businesses and entities. Specifically, the CRO Agreement provided that Shaffer was to assume the position of and responsibility as CRO of BDE, "with responsibilities to manage and control," *inter alia*, management of BDE's day to day business activities, cash management, planning and disbursements (including accounts payable and property preservation payables),

16

financial reporting to lenders and stakeholders, management and facilitation of restructuring plans, analysis and other ongoing activity, centralization and facilitation of data flow to invested parties and prospective purchasers of assets, preparation of assets for disposition (including partnership interests), management and implementation of the wind-down and liquidation of the business including work with insolvency counsel to assist with the process, work on bankruptcy preparation and data collection, development of appropriate management and employee programs to assist with all of the foregoing, hire and terminate employees or agents as deemed necessary, execute, deliver and bind BDE to contracts, agreements, deeds, bills of sale or instruments necessary to manage and operate BDE, protect and preserve BDE's property and assets (including partnership interests), and market and sell the property and assets (including partnership interests).

69.    At Defendant's insistence, Shaffer and MAA were to be hired by BDE with payment guaranteed by S&T Bank. For their work, Shaffer and MAA were paid by S&T Bank with funds taken from Chuck's deposit account held at S&T Bank's brokerage division (*i.e.*, Chuck's Wealth Management Account), in the amount of approximately $285,237.38..

70.    At all times relevant to the claims raised in this *Complaint*, Shaffer reported and answered to Defendant in respect to performing his various duties under the CRO Agreement; he did not report or answer to BDE's board of directors, shareholders or longstanding management, Eric or Chuck. Upon his arrival in Wyoming, if not before, and upon information and belief, although Shaffer had been technically appointed the controlling officer of BDE, he was, in reality, in his CRO position to safeguard and shore-up S&T Bank's position and/or collateral and/or to serve in such position for the benefit of said bank. At all times relevant to the claims raised in this *Complaint*, Shaffer was burdened by a significant conflict of interest, on the one hand serving as CRO of BDE and, on the other hand, fulfilling the desires and instructions of

17

S&T Bank.

71.     At all times relevant to the claims raised in this *Complaint*, Shaffer neither reported to nor discussed business decisions with BDE officers, directors, shareholders management, or Plaintiffs. Shaffer reported to and discussed such things with, and received all instructions concerning the management of the affairs and assets of BDE from, Defendant. In truth and fact, Shaffer and MAA were retained by and served as the agent of Defendant and at all times relevant hereto, acted in the best interests of Defendant at its sole instructions and insistence.

72.     On or about April 9, 2009, Shaffer arrived in Wyoming and assumed his duties as CRO of BDE, reporting to and receiving instructions from Defendant in his commission of those duties. In further commission of his duties as CRO, Shaffer obeyed and relied upon Defendant's instructions and advice as to any managerial and financial decisions of BDE, its businesses or its operations, including without limitation the Brikis Report. In other words, although Shaffer was supposed to serve as CRO of BDE with the final say on all expenditures, he received his marching orders from Defendant and Defendant was calling the shots with respect to BDE affairs.

73.     After assuming his post with BDE, Shaffer presented weekly budgetary reports to S&T Bank's loan officer which outlined BDE's monetary needs for the current week. That loan officer would, in turn, take Shaffer's budget to other bank employees for review and approval and would later report the results of his superiors' decisions to Shaffer and would otherwise scrutinize the proposed budget and critical expenses that Shaffer had identified that needed to be paid.

74.     On or about April 13, 2009, well after Defendant's demands for BDE's appointment of Shaffer as CRO had been met and Eric and Chuck were removed from BDE's

18

payroll, Defendant finally transmitted the first draft of a Forbearance Agreement to BDE. That draft Agreement did not comport with discussions conducted by BDE and Defendant previously, and this draft was never executed.

75. On or about April 16, 2009, Shaffer, acting as CRO of BDE and at Defendant's specific instruction, dismissed Eric (who at that time served as the president and chief executive officer of BDE and was also a shareholder and director of BDE) from his day-to-day duties at BDE, and instructed him to vacate his position and announce to BDE employees the change in management and require unconditional cooperation by all employees with Shaffer's instructions. In addition, Shaffer informed Eric that S&T Bank did not want him at BDE and to move on to pursue other opportunities but that Defendant would pay him through April 30, 2009.

76. Shaffer had no concerns for the limited partnership Plaintiffs, their financial interests or their assets, advising Eric to the effect that, "as far as I'm concerned, you shouldn't care about [Plaintiffs]; your best alternative is to walk away."

77. Once Eric was eliminated from BDE, Shaffer received near unfettered cooperation from S&T Bank for his weekly budgetary needs.

78. During the ensuing days or weeks, Shaffer analyzed the financial position of BDE and determined that BDE's business was reorganizable, that the only hope for BDE and its operations was through a Chapter 11 reorganization, and that because of mounting claims of unpaid vendors, and numerous leases and surface rights that were about to expire, there was an urgency to fully assess the situation and commence Chapter 11 proceedings.

79. On or about May 7, 2009, at Defendant's direction, Shaffer traveled to meet with S&T Bank at its Pittsburgh, Pennsylvania offices to report on his progress at BDE. BDE's counsel was also present at that meeting. There, Shaffer reported to Defendant that he was pleased with the cooperation by BDE, that he had uncovered no malfeasance by BDE or its

19

management in their conduct of the operations of BDE's businesses, that the Brikis Report was seriously flawed and erroneous, that after his investigation he had concluded there were no buyers for BDE's operations or assets, in which the limited partnership Plaintiffs held interests or from which they stood to benefit, and that, as BDE had previously suggested, BDE should commence Chapter 11 proceedings. The details of Shaffer's report to the bank were not shared with BDE or its management, directors or shareholders let alone Plaintiffs.

80. S&T Bank's response to Shaffer's bankruptcy proposal was that it was amenable to a bankruptcy, but that it wanted a clear understanding of its "collateral picture" before such filing. Defendant instructed Shaffer to go back to Wyoming to plan for the bankruptcy and provide it, within the next 30 days, a second report of its collateral picture so that the bank could consider the bankruptcy and providing BDE with a postpetition debtor-in-possession loan.

81. Defendant tacitly approved the filing of Chapter 11 cases for BDE by instructing BDE's private counsel to begin preparing the necessary bankruptcy paperwork, for which Defendant would pay BDE's counsel fees.

82. Upon his return to Wyoming, Shaffer informed the BDE staff that it would be going through a Chapter 11 proceeding, and he enlisted their assistance in working on bankruptcy Schedules and compiling other information necessary for a Chapter 11 filing. Shaffer planned for a filing by the end of May 2009 based in part on payments that were due to surface and mineral owners in early June 2009.

83. BDE's private counsel also left the meeting and began preparing the paperwork necessary to commence Chapter 11 proceedings; however, as set forth herein, Defendant later arbitrarily and capriciously changed its mind and refused to pay BDE's counsel for his preparation of such Chapter 11 proceedings and refused to make available Chapter 11 financing for BDE. BDE was unable to locate any other potential Chapter 11 funding.

84.    On or about May 8, 2009, Defendant advised Mr. Groskop that an updated draft of the Forbearance Agreement was forthcoming. Around that same date, Defendant and Shaffer were not timely paying BDE bills, refusing to pay critical vendors and expenses, including electricity bills, certain terms of leasing, incurring delay rental charges and pipeline charges, ignoring surface use agreements and broker/dealer invoices that had come due, and otherwise failed to operate the Wells in a prudent and diligent manner or the business of BDE in similar fashion, thus further compromising Plaintiffs' interests and assets.

85.    Despite previous extensive negotiations and representations, Defendant failed and refused to enter into the proposed Forbearance Agreement.

86.    Approximately 30 days after Shaffer's first meeting with S&T Bank, Shaffer and BDE's counsel returned to meet again with Defendant concerning debtor-in-possession financing requirements, the bank's collateral position and other matters.

87.    At this meeting Shaffer reported that BDE would need approximately $1,000,000-$1,800,000 in debtor-in-possession financing to get through Chapter 11 proceedings and that the Brikis Report misrepresented S&T Bank's collateral position.  The details of this report to the bank were not shared with BDE or its management, directors or shareholders let alone Plaintiffs.

## G.    *Termination of the CRO and Return of BDE and Partnership Assets to BDE's Officers and Directors.*

88.    Approximately four days after Shaffer's second meeting with S&T Bank was concluded, Defendant's representatives contacted Shaffer in Wyoming and advised that the bank would not follow any of Shaffer's recommended work-out options, that it would not fund any debtor-in-possession loan, and that it would not fund any more BDE checks.  When Shaffer presented the issue of the payment of MAA's final invoice for services rendered, S&T Bank willingly paid said invoice without question and with the funds held in Chuck's deposit account with S&T brokerage department (*i.e.*, his Wealth Management Account).

21

.     ı

89.    On or about June 2, 2009, Shaffer was informed S&T Bank would no longer fund his employment with BDE. Shaffer advised Eric that his job was done because the bank would no longer pay him, and Shaffer inquired whether BDE could pay to keep him on. After Eric declined the offer, Shaffer was relieved of his duties. Defendant then refused to honor BDE checks that it had previously advised Shaffer it would honor, including payment of approximately $50,000 for BDE's counsel's fees in preparing Chapter 11 filings.

90.    Following S&T Bank's directive for Shaffer's departure from BDE and termination of the CRO Agreement, Eric and Chuck returned to their posts at BDE. Once there, Eric and Chuck found, *inter alia*, that Defendant and Shaffer had failed to timely pay numerous vendors, that numerous checks written on BDE's accounts were not going to be honored by Defendant, that during the time that Shaffer served as CRO BDE's day to day accounting necessary for preservation and maintenance of the Plaintiffs' assets was ignored and/or impaired, that Defendant and Shaffer had failed to return electricity to the Wells, that Defendant and Shaffer had failed to comply with state and federal regulations and requirements, that due to nonpayment of vendors numerous liens had been filed against Plaintiffs' property and in certain cases reduced to judgment, that the Wells were still shut-in and not in production, that BDE and its operations had suffered unnecessary delay rental charges, pipeline charges, loss of production and loss of reserves, and that numerous leases and surface use agreements were subject to loss and/or in fact lost.

91.    Prior to Defendant's acts in domination and control of BDE, its businesses and operations, and Plaintiffs' property, certain of the Wells were in production, certain of the Wells were ready for production, certain of the Wells were in the process of de-watering or ready to begin de-watering, and the reserves under the properties held by the Wells were estimated to be in the tens of millions of dollars.

22

Judicial District of Wyoming.

**III.   _CLAIMS FOR RELIEF:_**

**A.   _CLAIM FOR RELIEF NO. 1 – Negligence and Gross Negligence._**

96.   Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

97.   Defendant, itself and by and through the CRO whom Defendant required be appointed, dominated and controlled BDE and BDED such that BDE and BDED were each mere instrumentalities of Defendant and the _alter egos_ of Defendant.

98.   Defendant, in its role as _de facto_ and actual Managing General Partner of Plaintiffs, and as a lender with knowledge and understanding of the reasonably foreseeable consequences of its actions, owed Plaintiffs duties of due and reasonable care.

99.   Defendant breached the duties it owed to Plaintiffs.

100.   Plaintiffs suffered injuries, losses and lost profits in as a result of Defendant's breaches of duties owed to Plaintiffs, and those breaches of duties were a substantial factor in bringing about Plaintiffs' injuries.

101.   Defendant's breaches of duties owed to Plaintiffs directly and proximately caused Plaintiffs' injuries and losses as set forth herein, and those injuries and losses were the natural and probable consequences of Defendant's negligent and grossly negligent acts and omissions.

102.   Defendant, through its representatives and agents, supplied false information to BDE, BDED and the CRO in the course of BDE's and BDED's businesses as General Managing Partners of their respective limited partnership Plaintiffs.

103.   Defendant, through its representatives and agents, supplied such information for the guidance of BDE, BDED and the CRO in the businesses of BDE, BDED and the limited partnership Plaintiffs, with the intent that BDE, BDED and the CRO rely on such information.

24

104. Defendant, through its representatives and agents, failed to exercise reasonable care in relating the information provided to BDE, BDED and the CRO, and BDE and the CRO acted upon such information in the conduct of BDE's and BDED's businesses and that of Plaintiffs.

105. Plaintiffs, by and through their agent and General Managing Partner, BDE and BDED, and their CRO, reasonably believed Defendant's representations to be true and justifiably relied upon the false information provided by Defendant.

106. Plaintiffs suffered damages as a direct and proximate result of the aforesaid reliance in an amount an amount the jury may determine at trial.

107. Defendant is liable to Plaintiffs for the actual damages they have suffered at the hands of Defendant and through Defendant's conduct in the sums set forth herein and in an amount the jury may determine at trial, for all consequential and incidental damages and prejudgment interest as allowed by law.

108. Because Defendant's conduct was knowingly reckless and grossly negligent, Defendant is liable to Plaintiffs for punitive damages in an amount the jury may determine at trial.

WHEREFORE, Plaintiffs pray the Court will enter judgment in their favor and against Defendant for Defendant's negligence and gross negligence and/or negligent misrepresentations in an amount that compensates Plaintiffs for their actual damages, their consequential and incidental damages, lost profits, prejudgment interest as allowed by law, punitive damages in an amount set by the jury at trial and the costs and attorneys' fees Plaintiffs expend in this action. Plaintiffs also pray the Court will grant them such other and further relief deemed to be just and proper.

**B.**     *CLAIM FOR RELIEF NO. 2 – Breach of Fiduciary Duty.*

109.     Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

110.     Defendant, itself and by and through the CRO whom Defendant required be appointed, dominated and controlled BDE and BDED such that BDE and BDED were each mere instrumentalities of Defendant and the *alter egos* of Defendant.

111.     While Defendant, itself and by and through the CRO, dominated and controlled BDE and BDED, Defendant's interests were directly adverse to those of the limited partnership Plaintiffs and, in fact, Defendant held interests that were detrimental to and in competition with interests held by Plaintiffs.

112.     Defendant's domination and control of BDE and BDED, by itself and through the CRO, serving as the sole officer in charge of the business affairs and operations of BDE and BDED, who served as general partners of the limited partnership Plaintiffs, rendered Defendant the *de facto* and actual operator of the Wells and General Managing Partner of the limited partnership Plaintiffs, in a direct, fiduciary role vis-à-vis Plaintiffs. Defendant owed fiduciary duties to Plaintiffs, including but not limited to a duty of loyalty and a duty of due care.

113.     While Defendant, itself and by and through its required CRO, dominated and controlled BDE and BDED and served as the *de facto* and actual operator of the Wells and Managing General Partner of Plaintiffs, Defendant breached its fiduciary duties owed to Plaintiffs. Defendant, by taking over the businesses and operations of BDE and BDED itself and by and through its CRO, did so for its own selfish purposes and in competition for the Wells and other assets in which Plaintiffs held valuable interests. Defendant also appropriated or attempted to appropriate to its own benefit limited partnership opportunities in which Plaintiffs held or would have held valuable interests. Defendant further conducted the business and operations of

the limited partnership Plaintiffs, and safeguarded the Wells and the assets of Plaintiffs, in a grossly negligent and reckless manner.

114.  As a result of the various breaches of fiduciary duties owed to Plaintiffs by Defendant and its agent(s), Plaintiffs have suffered damages in an amount the jury may determine at trial.

115.  Defendant is liable to Plaintiffs for the actual damages they have suffered at the hands of Defendant and through Defendant's conduct in the sums set forth herein or proven at trial, for all consequential and incidental damages, lost profits and prejudgment interest as allowed by law.

116.  Because Defendant's conduct was intentional, malicious or, at a minimum, knowingly reckless and grossly negligent, Defendant is liable to Plaintiffs for punitive damages in an amount the jury may determine at trial.

WHEREFORE, Plaintiffs pray the Court will enter judgment in their favor and against Defendant for Defendant's breaches of fiduciary duties in an amount that compensates Plaintiffs for their actual damages, their consequential and incidental damages, lost profits, prejudgment interest as allowed by law, punitive damages in an amount set by the jury at trial and the costs and attorneys' fees Plaintiffs expend in this action. Plaintiffs also pray the Court will grant them such other and further relief deemed to be just and proper.

### C.   *CLAIM FOR RELIEF NO. 3 – Breach of Duty of Good Faith and Fair Dealing.*

117.  Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

118.  Defendant, itself and with the assistance of the CRO it required BDE and BDED to retain, dominated and controlled BDE and BDED and served as the *de facto* and actual operator of the Wells and Managing General Partner of Plaintiffs.

27

119.    Defendant owed Plaintiffs a duty to act in good faith and to deal, in all ways, fairly with Plaintiffs and with respect to the businesses and operations of Plaintiffs and with respect to those matters that impacted or might impact Plaintiffs, their assets and their operations.

120.    In this relationship with Plaintiffs and as direct creditor of BDE and BDED, Defendant also held a special relationship to and with Plaintiffs outside the limited partnership structures.

121.    Defendant failed to act in good faith and to deal fairly with Plaintiffs, BDE and BDED in, *inter alia*, Defendant's seizure and encumbrance of their interests and assets, Defendant's wrongful domination and control of Plaintiffs' Managing General Partners, BDE and BDED, Defendant's assumption of the operations of the businesses and affairs of BDE and BDED and Defendant's undertaking and discharge of the duties of BDE and BDED as operators of the Wells and General Managing Partners of Plaintiffs.

122.    As a result of Defendants' breaches of its duties of good faith and fair dealing as alleged herein, Plaintiffs have suffered damages in an amount the jury may determine at trial.

123.    Defendant is liable to Plaintiffs for the actual damages they have suffered at the hands of Defendant and through Defendant's conduct in the sums set forth herein, for all consequential and incidental damages, lost profits and prejudgment interest as allowed by law.

124.    Because Defendant's conduct was intentional, malicious or, at a minimum, knowingly reckless, Defendant is liable to Plaintiffs for punitive damages in an amount as the jury may determine at trial.

WHEREFORE, Plaintiffs pray the Court will enter judgment in their favor and against Defendant for Defendant's breaches of its duties of good faith and fair dealing in an amount that compensates Plaintiffs for their actual damages, their consequential and incidental damages, lost profits, prejudgment interest as allowed by law, punitive damages in an amount set by the jury at

28

tria¹ and the costs and attorneys' fees Plaintiffs expend in this action.  Plaintiffs also pray the Court will grant them such other and further relief deemed to be just and proper.

**D.      CLAIM FOR RELIEF NO. 4 – Intentional Interference with Contractual Relations, Business Expectancy and Prospective Economic Advantage.**

125.    Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

126.    Plaintiffs were parties to various contracts concerning the Wells and their maintenance and operation as well as the maintenance and oversight of their assets, and Defendant, itself or through its CRO, had actual and constructive knowledge of the existence and import of such contracts.

127.    Plaintiffs were also disclosed, third-party beneficiaries to various contracts between BDE or BDED and others that directly affected the operation of Plaintiffs' businesses and the maintenance and operation of the Wells and Plaintiffs' assets.  Defendant, itself or through its CRO, had actual and constructive knowledge of the existence and import of such contracts and that Plaintiffs would stand to benefit from or suffer detriment because of said contracts.

128.    Defendant intentionally and improperly interfered, or caused Shaffer, BDE and/or other third-parties to interfere, with the performance of said contracts by inducing or otherwise causing a breach of said contracts, improperly induced or otherwise caused parties to said contracts to not enter into or continue prospective contractual relations with Plaintiffs, and improperly prevented Plaintiffs from acquiring or continuing contractual relations under those contracts or with the contracting parties.

129.    Plaintiffs sustained pecuniary losses and injury as a direct and proximate result of Defendant's interference as alleged herein in an amount the jury may determine at trial.

130.    Defendant is liable to Plaintiffs for the actual damages they have suffered at the

29

hands of Defendant and through Defendant's wrongful and intentional interference with Plaintiffs' legitimate contractual rights, business expectancy and/or prospective economic advantage, for all consequential and incidental damages, lost profits and prejudgment interest as allowed by law.

131.    Because Defendant's conduct was knowingly reckless and grossly negligent, Defendant is liable to Plaintiffs for punitive damages in an amount as the jury may determine at trial.

WHEREFORE, Plaintiffs pray the Court will enter judgment in their favor and against Defendant for Defendant's wrongful and intentional interference with Plaintiffs' legitimate contractual rights, business expectancy and/or prospective economic advantage in an amount that compensates Plaintiffs for their actual damages, their consequential and incidental damages, lost profits, prejudgment interest as allowed by law, punitive damages in an amount set by the jury at trial and the costs and attorneys' fees Plaintiffs expend in this action. Plaintiffs also pray the Court will grant them such other and further relief deemed to be just and proper.

E.    **CLAIM FOR RELIEF NO. 5 – Slander of Title.**

132.    Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

133.    Defendant made false and malicious statements in disparagement of Plaintiffs' title in, to and under real or personal property, or Plaintiffs' interests therein including without limitation mineral interests in CBM and/or the Wells.

134.    Defendant's false and malicious statements as alleged herein caused Plaintiffs to sustain special damages, in an amount the jury may determine at trial.

135.    Defendant's false and malicious statements as alleged herein were neither justified nor privileged in any way, and such statements were made in a knowingly reckless and

30

grossly negligent fashion, rendering Defendant liable to Plaintiffs for punitive damages in an amount the jury may determine at trial.

136.    Defendant is liable to Plaintiffs for the actual damages they have suffered at the hands of Defendant and through Defendant's slander of title, for all consequential and incidental damages, lost profits and prejudgment interest as allowed by law. Plaintiffs are also entitled to a Judgment that clears Defendant's cloud of their rights, titles and interests in and to Plaintiffs' assets and interests.

WHEREFORE, Plaintiffs pray the Court will enter judgment in their favor and against Defendant for Defendant's slander of title in an amount that compensates Plaintiffs for their actual damages, their consequential and incidental damages, lost profits, prejudgment interest as allowed by law, punitive damages in an amount set by the jury at trial and the costs and attorneys' fees Plaintiffs expend in this action.   Plaintiffs also pray the Court will clear Defendant's cloud upon their rights, titles and interests as alleged herein or determined at trial. Plaintiffs further pray the Court will grant them such other and further relief deemed to be just and proper.

**F.    *CLAIM FOR RELIEF NO. 6 – Breach of Contract.***

137.    Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

138.    Plaintiffs entered into one or more contracts with BDE and BDED, including without limitation limited partnership agreements, operating agreements, drilling contracts and other similar instruments.

139.    BDE and BDED were required, under those contracts, to undertake certain obligations and exercise certain responsibilities in a timely and diligent manner.

140.    While Defendant dominated and controlled BDE and BDED, and assumed and

31

exercised its position as General Managing Partner of Plaintiffs, Defendant breached those contracts with Plaintiffs.

141.    Plaintiffs sustained damages due to the various breaches of contract.

142.    Defendant is liable to Plaintiffs for the actual damages they have suffered at the hands of Defendant and through Defendant's breach of contracts with Plaintiffs and in an amount the jury may determine at trial, for all consequential and incidental damages, lost profits and prejudgment interest as allowed by law.

WHEREFORE, Plaintiffs pray the Court will enter judgment in their favor and against Defendant for Defendant's breaches of contract in an amount that compensates Plaintiffs for their actual damages, their consequential and incidental damages, lost profits, prejudgment interest as allowed by law and the costs and attorneys' fees Plaintiffs expend in this action. Plaintiffs also pray the Court will grant them such other and further relief deemed to be just and proper.

G.    *CLAIM FOR RELIEF NO. 7 – Indemnification and Contribution.*

143.    Plaintiffs reallege, restate and incorporate herein by reference each and every allegation contained in the preceding and subsequent paragraphs as if fully set forth herein.

144.    Defendant, through its wrongful and tortious acts, accomplished by itself and by and through the CRO in dominating and controlling BDE and BDED, caused Plaintiffs' interests and assets, including without limitation the Wells, to become encumbered, lose value, lapse or otherwise be subjected to loss to the detriment of Plaintiffs, to third-parties and otherwise.

145.    In addition, Defendant's wrongful and tortious acts alleged herein, accomplished by itself and by and through the CRO in dominating and controlling BDE and BDED, resulted in Plaintiffs' assets, including without limitation the Wells, being in non-compliance with

32

governmental and/or regulatory authorities and subject to and/or resulting in the imposition of adverse interests, liens, lienable claims or rights, fines and/or forfeiture to said authorities.

146.    Because said authorities' or third-parties' imposition of claims, adverse interests, liens, lienable claims or rights, fines and/or forfeitures to be imposed upon BDE and/or BDE and/or Plaintiffs' assets, including without limitation the Wells, is a direct result of the malfeasance of Defendant, through its own acts and omissions and those of its actual and *de facto* agent, Shaffer, Defendant should be held liable to said authorities and/or third-parties in the place and stead of BDE and/or BDE and/or Plaintiffs' assets and the Wells and indemnify Plaintiffs and their assets, including without limitation the Wells, of and from any and all governmental authorities' or and/or third-parties' claims, adverse interests, liens, lienable claims or rights, fines and/or forfeitures. Defendant should also be required to contribute to Plaintiffs, in damages, such amount that will forever satisfy and/or remove and/or cure such authorities' or third-parties' claims, adverse interests, liens, lienable claims or rights, fines and/or forfeiture to said authorities

WHEREFORE, Plaintiffs pray the Court will enter judgment in their favor and against Defendant requiring Defendant to indemnify Plaintiffs and their assets, including without limitation the Wells, of and from any claims, fines, penalties, debts, lapse, forfeiture, liens or encumbrances of any governmental authority or third-party and/or require Defendant to be liable in contribution for such sums that will forever satisfy and/or remove and/or cure such claims, fines, penalties, debts, lapse, forfeiture, liens or encumbrances. Plaintiffs also pray the Court will grant them such other and further relief deemed to be just and proper.

**WHEREFORE,** Plaintiffs pray that the Court enter judgment on all claims for relief alleged herein in their favor, jointly and severally, and against Defendant to compensate Plaintiffs for all actual damages sustained by them as a result of the acts and omissions set forth

33

in this *Complaint*, all consequential and incidental damages sustained by them as a result of the

acts and omissions set forth in this *Complaint*, prejudgment interest, and punitive damages in an

amount as the jury may determine, as applicable, that this Court award Plaintiffs their attorneys'

fees and costs incurred in this proceeding, and that this Court grant them such other and further

relief deemed to be just and proper.

Respectfully submitted,

**OF COUNSEL:**
Mark A. Waller, Esq.
David H. Herrold, Esq.
Michael J. Cooper, Esq.
**SNEED|LANG|HERROLD PC**
1700 Williams Center Tower I
One West Third Street
Tulsa, Oklahoma 74103
tel 918·588·1313 | fax 918·588·1314
E-mail:  mwaller@sneedlangherrold.com
          dherrold@sneedlangherrold.com
          mcooper@sneedlangherrold.com

Gregory L. Goddard (Wyoming Bar #5-1252)
GODDARD, WAGES & VOGEL, P.C.
412 North Main Street
Buffalo, Wyoming 82834
tel (307) 684-9595 | fax (307) 684-9285
E-mail:  gwv@wyoming.com

**COUNSEL FOR THE PLAINTIFFS**

The foregoing is a true and correct copy of the Original
instrument which is on file or of record in this court.
Fourth Judicial District Court, Johnson County, WY
Thelma M. Axberg, Clerk of District Court
Certified this 10 day of ___, 20 10
By ___ Deputy
Term of Office expires on January 3, 2011.

# EXHIBIT "B"

## IN THE DISTRICT COURT OF JOHNSON COUNTY, WYOMING

### FOURTH JUDICIAL DISTRICT

(1) BLACK DIAMOND ENERGY PARTNERS 2001-A LTD.,
(2) BLACK DIAMOND ENERGY PARTNERS 2001-B LTD.,
(3) BLACK DIAMOND ENERGY PARTNERS 2002-A LTD.,
(4) BLACK DIAMOND ENERGY PARTNERS 2002-B LTD.,
(5) BLACK DIAMOND ENERGY PARTNERS 2003-A LTD.,
(6) BLACK DIAMOND ENERGY PARTNERS 2003-B LTD.,
(7) BLACK DIAMOND ENERGY PARTNERS 2004-A LTD.,
(8) BLACK DIAMOND ENERGY PARTNERS 2004-B LTD.,
(9) BLACK DIAMOND ENERGY PARTNERS 2005-A LTD.,
(10) BLACK DIAMOND ENERGY PARTNERS 2005-B LTD.,
(11) BLACK DIAMOND ENERGY PARTNERS 2005-C LTD.,
(12) BLACK DIAMOND ENERGY PARTNERS 2006-A LTD.,
(13) BLACK DIAMOND ENERGY PARTNERS 2006-B LTD.,
(14) BLACK DIAMOND ENERGY PARTNERS 2007-A LTD.,
(15) BLACK DIAMOND ENERGY PARTNERS 2007-B LTD.,
(16) BLACK DIAMOND ENERGY PARTNERS 2008-A LTD.,
(17) BLACK DIAMOND ENERGY PARTNERS 2008-B LTD.

Plaintiffs,

vs.

S&T BANK,

Defendant.

FILED 4TH JUDICIAL DISTRICT COURT

CASE NO. ———

*Kc* AUG 0 6 2010

JOHNSON COUNTY, WYOMING
Clerk of District Court

**Civil Action No:**

**Cv -2010- 0 1 1 4**

## AFFIDAVIT OF GREG L. GODDARD

STATE OF WYOMING )
                                            )ss
COUNTY OF JOHNSON )

THE UNDERSIGNED, being of legal age and first duly sworn, does depose and say as

follows:

1. I am attorney for the Plaintiffs in the above-captioned action.

2. I am a resident of Johnson County, Wyoming.

3. I am an adult person, and I make this affidavit of my own personal knowledge.

4. Defendant in this action is not located in the State of Wyoming.

5. Defendant's address is 800 Philadelphia Street, Indiana, Pennsylvania, 15701.

6. Therefore, service should be by registered mail pursuant to <u>Wyoming Rules of Civil Procedure</u>, Rule 4(l)(2).

Further Affiant sayeth naught.

DATED this _____ day of August, 2010.

Greg L. Goddard

Subscribed and sworn to before me by Greg L. Goddard this 6th day of August, 2010.

Witness my hand and official seal.

Mary K. Talbott
Notary Public

My commission expires: 9-17-2013

MARY K. TALBOTT   NOTARY PUBLIC
COUNTY OF   STATE OF
JOHNSON   WYOMING
MY COMMISSION EXPIRES SEPTEMBER 17, 2013

2

FILED 4TH JUDICIAL DISTRICT COURT

CASE NO. _____

AUG 1 6 2010

JOHNSON COUNTY, WYOMING  SLP
_____
Clerk of District Court

| SENDER: COMPLETE THIS SECTION | COMPLETE THIS SECTION ON DELIVERY |
|---|---|
| ■ Complete items 1, 2, and 3. Also complete Item 4 if Restricted Delivery is desired.<br>■ Print your name and address on the reverse so that we can return the card to you.<br>■ Attach this card to the back of the mailpiece, or on the front if space permits. | A. Signature<br>X _Bill Madey_  ☐ Agent ☐ Addressee<br>B. Received by (Printed Name)  C. Date of Delivery<br>BILL MADEY  7-12-10 |
| 1. Article Addressed to:<br><br>S&T Bank<br>800 Philadelphia Street<br>Indiana, PA  15701 | D. Is delivery address different from item 1? ☐ Yes<br>If YES, enter delivery address below: ☐ No |
| | 3. Service Type<br>☒ Certified Mail  ☐ Express Mail<br>☐ Registered  ☐ Return Receipt for Merchandise<br>☐ Insured Mail  ☐ C.O.D.<br>4. Restricted Delivery? (Extra Fee)  ☒ Yes |
| 2. Article Number<br>(Transfer from service label)  7008 1300 0000 7873 1405 | |
| PS Form 3811, February 2004     Domestic Return Receipt | 102595-02-M-1540 |

# IN THE DISTRICT COURT OF JOHNSON COUNTY, WYOMING

## FOURTH JUDICIAL DISTRICT

(1) BLACK DIAMOND ENERGY PARTNERS 2001-A LTD.,
(2) BLACK DIAMOND ENERGY PARTNERS 2001-B LTD.,
(3) BLACK DIAMOND ENERGY PARTNERS 2002-A LTD.,
(4) BLACK DIAMOND ENERGY PARTNERS 2002-B LTD.,
(5) BLACK DIAMOND ENERGY PARTNERS 2003-A LTD.,
(6) BLACK DIAMOND ENERGY PARTNERS 2003-B LTD.,
(7) BLACK DIAMOND ENERGY PARTNERS 2004-A LTD.,
(8) BLACK DIAMOND ENERGY PARTNERS 2004-B LTD.,
(9) BLACK DIAMOND ENERGY PARTNERS 2005-A LTD.,
(10) BLACK DIAMOND ENERGY PARTNERS 2005-B LTD.,
(11) BLACK DIAMOND ENERGY PARTNERS 2005-C LTD.,
(12) BLACK DIAMOND ENERGY PARTNERS 2006-A LTD.,
(13) BLACK DIAMOND ENERGY PARTNERS 2006-B LTD.,
(14) BLACK DIAMOND ENERGY PARTNERS 2007-A LTD.,
(15) BLACK DIAMOND ENERGY PARTNERS 2007-B LTD.,
(16) BLACK DIAMOND ENERGY PARTNERS 2008-A LTD.,
(17) BLACK DIAMOND ENERGY PARTNERS 2008-B LTD.

Plaintiffs,

vs.

S&T BANK,

Defendant.

FILED 4TH JUDICIAL DISTRICT COURT

CASE NO. _____

SEP 0 9 2010

JOHNSON COUNTY, WYOMING

Clerk of District Court

Civil Action No: CV-2010-0114

## MOTION FOR ADMISSIONS PRO HAC VICE

Gregory L. Goddard, attorney for the Plaintiffs, moves this Court to grant admission to Mark A. Waller and David H. Herrold (hereinafter "Applicants") in this case and would respectfully show the Court as follows:

1.     Applicants are attorneys and members of Sneed Lang Herrold PC, a law firm in Tulsa, Oklahoma, who have been retained by Plaintiffs as counsel in this action.

2.     Applicants have been and are presently members of and in good standing with the Bar of the State of Oklahoma.  Mark A. Waller's bar license number is 14831 and David H. Herrold's bar license number is 17053.

3.     Applicants have complied with Rule 11 of the Rules Providing for the

Organization and Government of the Bar Association and Attorneys at Law of the State of Wyoming and have received certificates of compliance indicating the same. The Certificates of Compliance with Rule 11 are attached hereto and marked as Exhibit "A."

4.      Applicants have read and are familiar with the Uniform Rules for the District Courts of the State of Wyoming and will comply with the standards of practice set out therein.

5.      As mandated by Rule 104 of the Uniform Rules for the District Courts of the State of Wyoming, Applicants have associated with the undersigned local counsel, who will perform all duties required under the Rule.

Wherefore, Applicants pray that this Court enter an Order permitting the admission of Mark A. Waller and David H. Herrold to the Wyoming Fourth Judicial District *pro hac vice* for this case only.

Respectfully submitted,

**OF COUNSEL:**
Mark A. Waller, Esq.
David H. Herrold, Esq.
**SNEED|LANG|HERROLD PC**
1700 Williams Center Tower I
One West Third Street
Tulsa, Oklahoma 74103
tel 918·588·1313 | fax 918·588·1314
E-mail: mwaller@sneedlangherrold.com
        dherrold@sneedlangherrold.com

Gregory L. Goddard (Wyoming Bar #5-1252)
GODDARD, WAGES & VOGEL, P.C.
412 North Main Street
Buffalo, Wyoming 82834
tel (307) 684-9595 | fax (307) 684-9285
E-mail: gwv@wyoming.com

**COUNSEL FOR THE PLAINTIFFS**

## Certificate of Service

I, Greg L. Goddard, attorney for Plaintiffs in the above-entitled matter, do hereby certify

that on the 9th day of September, 2010, I caused a true and correct copy of the foregoing Motion

for Admissions Pro Hac Vice to be served as follows:

Stuart R. Day  
Ryan J. Schwartz  
Williams, Porter, Day & Neville, PC  
P.O. Box 10700  
Casper, WY 82602

[✗] U.S. Mail  
[ ] Fed Ex  
[ ] Facsimile  
[ ] Hand-Delivered

Greg L. Goddard

3

**EXHIBIT A**



## CERTIFICATE OF COMPLIANCE
## WITH RULE 11

Mr. David Henry Herrold
Sneed Lang Herrold PC
1700 Williams Center Tower I, One West 3rd Street
Tulsa, OK 74103

RE:    Black Diamond Energy Partners 2001-A Ltd., et al. v. S&T Bank
       Case Number: CV-2010-0114, Fourth Judicial District Court

The above attorney has submitted an Application for Admission Pro Hac Vice to the Wyoming
State Bar, along with supporting documentation. This attorney is compliant with Rule 11 of the
Rules Providing for the Organization and Government of the Bar Association and Attorneys at
Law of the State of Wyoming.

The above attorney has associated with the following local counsel, who is an active member of
the Wyoming State Bar:

**Greg L. Goddard     5-1252**
**Goddard, Wages & Vogel**
**412 North Main Street**
**Buffalo, WY 82834**

Nancy Shore, Admissions Director

Dated: August 16, 2010



## CERTIFICATE OF COMPLIANCE
## WITH RULE 11

Mr. Mark Alston Waller
Sneed Lang Herrold PC
1700 Williams Center Tower I, One West 3rd Street
Tulsa, OK 74103

RE:    Black Diamond Energy Partners 2001-A Ltd., et al. v. S&T Bank
       Case Number: CV-2010-0114, Fourth Judicial District Court

The above attorney has submitted an Application for Admission Pro Hac Vice to the Wyoming
State Bar, along with supporting documentation. This attorney is compliant with Rule 11 of the
Rules Providing for the Organization and Government of the Bar Association and Attorneys at
Law of the State of Wyoming.

The above attorney has associated with the following local counsel, who is an active member of
the Wyoming State Bar:

**Greg L. Goddard    5-1252**
**Goddard, Wages & Vogel**
**412 North Main Street**
**Buffalo, WY 82834**

Nancy Shore, Admissions Director

Dated: August 16, 2010

IN THE DISTRICT COURT OF JOHNSON COUNTY, WYOMING

FOURTH JUDICIAL DISTRICT COURT

FILED 4TH JUDICIAL DISTRICT COURT
CASE NO. Cv - 2010-0114

| | | |
|---|---|---|
| BLACK DIAMOND ENERGY PARTNERS 2001-A LTD,<br>et al, | ) | SEP 1 0 2010 |
| | ) | JOHNSON COUNTY, WYOMING |
| Plaintiffs, | ) | |
| | ) | Clerk of District Court |
| vs. | ) | Civil No. 2010-0114 |
| | ) | |
| S&T BANK, | ) | |
| | ) | |
| Defendants. | ) | |

## STIPULATED MOTION TO EXTEND DEFENDANT'S TIME TO
## SERVE ITS RESPONSE TO PLAINTFFS' COMPLAINT

Plaintiffs Black Diamond Energy Partners 2001-A LTD, *et. al.*, by and through its undersigned counsel and Defendant, S&T Bank, specially appearing by and through its undersigned counsel of record, and hereby stipulate and agree on behalf of their respective clients that Defendant S&T Bank should be allowed to serve its response to Plaintiffs' *Complaint* on or before October 5, 2010

**WHEREFORE**, Plaintiffs Black Diamond Energy Partners 2001-A LTD, *et. al.* and Defendant S&T Bank, respectfully request this Court grant the *Stipulated Motion to Extend Defendant's Time to Serve Its Response to Plaintiff's Complaint* and allow Defendant S&T Bank through October 5, 2010 to serve its Response to Plaintiffs' Complaint.

**DATED** this 9th day of September, 2010.

Black Diamond Energy Partners 2001-A LTD,
*Et al,*

BY:

**GREG L. GODDARD   WSB #5-1252**
412 North Main Street
Buffalo, WY 82834

And

Mark A. Waller,
David H. Herrold
Michael J. Cooper
Sneed/Lang/Herrold PC
1700 Williams Center Tower I

One West Third Street
Tulsa, OK 74103

**Attorney for Plaintiffs**

S&T Bank, Defendant,

BY:

STUART R. DAY WSB # 5-2744
RYAN J. SCHWARTZ WSB # 6-3611
Williams, Porter, Day & Neville, PC
P.O. Box 10700
(159 N. Wolcott St., Suite 400((82601)
Casper, WY 82602
307-265-0700
307-266-2306 (fax)

And

John B. Joyce, PA Bar ID # 68242
Andrew G. Dittoe, PA Bar ID# 205453
Grenen & Birsic, PC
One Gateway Center, 9th Floor
Pittsburgh, PA 15222
412-281-7650
412-281-7657 (fax)

**Attorneys for Defendant S&T Bank**

**IN THE DISTRICT COURT OF JOHNSON COUNTY, WYOMING 4TH JUDICIAL DISTRICT COURT**

**FOURTH JUDICIAL DISTRICT COURT**          CASE NO. _CV-2010-0114_

SEP 1 0 2010

| | |
|---|---|
| BLACK DIAMOND ENERGY PARTNERS 2001-A LTD, )<br>*et al,* )<br> )<br>Plaintiffs, )<br> )<br>vs. )<br> )<br>S&T BANK, )<br> )<br> )<br>Defendants. ) | JOHNSON COUNTY, WYOMING<br>Clerk of District Court<br><br>Civil No. 2010-0114 |

### SPECIAL ENTRY OF APPEARANCE

**PLEASE ENTER THE SPECIAL APPEARANCE** of Stuart R. Day and Ryan Schwartz of the law firm Williams, Porter, Day & Neville, P.C. as counsel of record for Defendant S&T Bank to contest the assertion of personal jurisdiction over Defendant S&T Bank in the above captioned action.

**DATED** this _9th_ day of September, 2010.

S&T Bank, Defendant,

STUART R. DAY WSB # 5-2244
RYAN SCHWARTZ WSB # 6-3611
Williams, Porter, Day & Neville, PC
P.O. Box 10700
(159 N. Wolcott St., Suite 400((82601)
Casper, WY 82602
307-265-0700
307-266-2306 (fax)
Attorneys for Defendant S&T Bank

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing was served by placing a true and correct copy of the same in the United States mail, postage prepaid this 9th day of September, 2010 and addressed as follows:

Greg L. Goddard
412 North Main Street
Buffalo, WY 82834

Mark A. Waller,
David H. Herrold
Michael J. Cooper
Sneed/Lang/Herrold PC
1700 Williams Center Tower I
One West Third Street
Tulsa, OK 74103

Ryan Schwartz

# EXHIBIT "C"

| STATE OF WYOMING | ) | | IN THE DISTRICT COURT |
| | ) ss | | |
| COUNTY OF JOHNSON | ) | | FOURTH JUDICIAL DISTRICT |

| BLACK DIAMOND ENERGY PARTNERS | ) |
| 2001-A LTD., et al. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) Civil Action No.: CV-2010-0114 |
| vs. | ) |
| | ) |
| S&T BANK, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT S&T BANK'S NOTICE OF FILING OF PETITION AND NOTICE OF REMOVAL

Defendant S&T Bank, ("S&T"), by and through its counsel, Stuart R. Day and Ryan Schwartz of Williams, Porter, Day & Neville, P.C., and pursuant to 28 U.S.C. §1446(d) and U.S.D.C.L.R. 81.1, and hereby provides notice of filing a *Petition and Notice of Removal* in the United States District Court for the District of Wyoming on September 13, 2010. A true and correct copy of said *Petition and Notice of Removal* is attached hereto as Exhibit "A" and is served and filed herewith.

**DATED** this  13th  day of September, 2010.

Defendant S&T Bank

By:

Stuart R. Day, WSB #5-2244
Ryan Schwartz, WSB# 6-3611
Williams, Porter, Day & Neville, P.C.
159 North Wolcott, Suite 400 (82601)
P.O. Box 10700
Casper, Wyoming 82602-3902
(307) 265-0700
(307) 266-2306 facsimile
sday@wpdn.net

## CERTIFICATE OF SERVICE

The undersigned does hereby certify that a true and correct copy of the foregoing *Petition and Notice of Removal* was served upon counsel by placing the same in the United States mail, postage prepaid, and addressed to the following this ____/3rd____ day of September, 2010.

> Greg L. Goddard, WSB #5-1252
> Goddard, Wages & Vogel
> 412 North Main Street
> Buffalo, Wyoming 82834

Stuart R. Day